# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

HECTOR SALDIVAR, )
)
    Plaintiff, )
) Case No. 16-cv-00320-JED-JFJ
v. )
)
ABERDEEN DYNAMICS, LLC, )
)
)
    Defendant. )

## OPINION AND ORDER

Plaintiff Hector Saldivar ("Plaintiff") has brought this action against Defendant Aberdeen Dynamics, LLC ("Aberdeen") for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and for disability discrimination in employment under the American with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101, *et seq.* ("ADA"). Now before the Court is Aberdeen's Motion for Summary Judgment (Doc. 36). Plaintiff has filed a Response in Opposition (Doc. 42), and Aberdeen has filed a Reply (Doc. 47).

**I.**     **Background**

The following facts are supported by evidence in the record and are construed in favor of Plaintiff, the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Plaintiff was first hired by Aberdeen in August 2006 to work as a hydraulic technician. He held this position for two years before voluntarily leaving Aberdeen in August 2008. In 2011, Aberdeen rehired Plaintiff for the same position. After several months, Plaintiff was promoted to an inside sales position. Plaintiff had expressed interest in advancing within the company, and Joseph ("Joe") Martin, the company's president, believed Plaintiff had shown an aptitude for

performing the inside sales duties. (Doc. 36-7 at 6 [J. Martin Dep., p. 16]).[1] There was also an opportunity to earn commissions on sales in this new role. (*Id*. at 13 [J. Martin Dep., p. 34]). While Plaintiff did not begin earning commissions while in the inside sales position, he did receive a raise on August 1, 2011. (*Id*.; Doc. 36-4).

In December 2011, Joe Martin decided to move Plaintiff back to the service shop to work under Pete Martin, the shop manager. (Doc. 36-7 at 9, 12 [J. Martin Dep., p. 30, 33]; Doc. 36-15 at ¶¶ 2, 7]). There was still an opportunity to earn commissions in this new position if he could perform the job as it "needed to be done." (Doc. 36-7 at 14 [J. Martin Dep., p. 35]). Plaintiff received a merit raise on April 1, 2012, and began earning commissions on September 1, 2012. (Doc. 36-4). Plaintiff became eligible to receive commissions because "[h]e was putting in the effort and was improving, he was showing promise." (Doc. 36-7 at 15 [J. Martin Dep., p. 36]).

In this new position, Plaintiff was initially helping Pete with paperwork, though his role evolved over time into a lead position. (Doc. 36-5 at 2-9 [P. Martin Dep., pp. 14-21]). Eventually, Plaintiff was making all of the purchases for the shop, filling out 209 reports,[2] and submitting repair quotes to the salesmen to use with customers. (*Id*.). Plaintiff was also supervising the shop employees. (Doc. 42-1 at 3 [Pl. Dep., p. 42-44]).

A.  **The Moffatt Incident**

In February 2014, Aberdeen employee Mike Moffatt ("Moffatt") began making derogatory comments to Plaintiff. Upon learning that Plaintiff was born in the United States and his parents were from Mexico, Moffatt called Plaintiff's parents "wetback border jumpers." (*Id*. at 7 [Pl. Dep., p. 98]). Later that day, Moffatt came up to Plaintiff and a gaggle of other employees and used the

---

[1] The page numbers cited in this Opinion are those found in the header of each document.

[2] According to Pete Martin's deposition testimony, a 209 report is used to indicate whether a product is ready to be assembled in the shop. (Doc. 36-5 at 7 [Pete Martin Dep., p. 19]).

term "wetbacks" to describe patrons at an AutoZone Moffatt had visited over the weekend. (*Id*. at 7 [Pl. Dep., p. 99]). About a week later, Moffatt told Plaintiff that "a group of good ole boys needs to come and kill all those wetbacks and niggers" living in Tulsa. (*Id*. at 7 [Pl. Dep., p. 100]).

Plaintiff first reported the comments to Aberdeen's CEO, Dominic White, on March 14, 2014. (*Id*. at 8 [Pl. Dep., p. 101]). On March 17, 2014, Plaintiff met with Joe, Pete, Moffatt, and the human resources manager, Beverly Coulander ("Coulander"). (*Id*. at 8 [Pl. Dep., p. 101]). At the meeting, Joe Martin stated that he did not believe Moffatt was capable of making such remarks. (Doc. 42-1 at 9 [Pl. Dep., pp. 105, 107]). This caused Plaintiff to "shut down" and worry that there would be repercussions for making the complaint. (*Id*.).

When the meeting was over, Plaintiff outwardly expressed satisfaction with the resolution of his complaint. (Doc. 36-8 at 6-7 [Coulander Dep., pp. 22-23]). In fact, he was not happy about how the meeting went. (Doc. 42-1 at 9 [Pl. Dep. at 106]). Plaintiff met with Joe again on March 20, at which point Joe told Plaintiff that he did believe him. (*Id*. at 9 [Pl. Dep., p. 108]). The two men "shook hands on it," and Plaintiff felt satisfied that the matter was over. (*Id*.).

Also on March 20, an employee named Donnie Driscoll went into Pete Martin's office and told him he was willing to vouch for Plaintiff regarding Moffatt's derogatory remarks. (Doc. 36-5 at 31-32 [P. Martin Dep., pp. 66-67]). Pete was "very disappointed" because he thought the matter had been settled at the March 17 meeting. (*Id*. at 32 [P. Martin Dep., p. 67]). Pete was unaware that Plaintiff had had a follow-up discussion with Joe. (*Id*. at 37 [P. Martin Dep., p. 75]).

The next morning, on March 21, Pete Martin went to Plaintiff's office and began talking loudly and aggressively. (Doc. 42-1 at 10 [Pl. Dep., p. 112]). Pete told Plaintiff that he should be handling the Moffatt issue privately with HR, instead of "caus[ing] dissent out there with the employees." (Doc. 36-5 at 32 [P. Martin Dep., pp. 67]). Pete told Plaintiff that he thought he had

3

"shot [himself] in the foot on this one." (*Id*. at 33 [P. Martin Dep., p. 68]). Pete also told Plaintiff that his advancements at Aberdeen had come to an end and that he no longer supervised employees. (Doc. 42-1 at 10, 13 [Pl. Dep., pp. 112, 128]). Plaintiff then spoke with Joe Martin, who told him that if Pete said his advancement in the company was over, then that was true. (*Id*. at 14 [Pl. Dep., p. 129]).

### B. Plaintiff's Loss of Duties

The parties agree that Moffatt ultimately took over Plaintiff's role as supervisor over the shop employees, but they disagree as to when and why this occurred. Although Aberdeen asserts that Moffatt began taking over these duties in early 2014—before Plaintiff made his complaint to HR—Plaintiff has presented evidence that Joe and Pete had not discussed making any changes to Plaintiff's work duties before the complaint was made. (Doc. 36-5 at 27-28 [P. Martin Dep., pp. 49-50]; Doc. 42-2 at 7 [J. Martin Dep., p. 79]). According to Plaintiff, he was a supervisor "[u]ntil the day that [he] reported the Moffatt incident." (Doc. 42-1 at 3 [Pl. Dep., p. 44]). For purposes of summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255.

Plaintiff was also stripped of his duties concerning repair quotes. Pete Martin has testified that he began to see a large amount of errors in Plaintiff's work in January 2014—before the Moffatt incident. (Doc. 36-5 at 19 [P. Martin Dep., p. 39]). According to Pete, the company started to look for an internal candidate to take over Plaintiff's repair quoting duties. (*Id*. at 20 [P. Martin Dep., p. 40]). Derek Moody was identified as an employee who "knew the repair business." (*Id*.). Moody began training with Plaintiff and slowly took over these duties over the course of several months. (*Id*. at 21 [P. Martin Dep., p. 41]). Notably, Plaintiff has presented evidence that Derek Moody was not hired by Aberdeen until September 2014—several months after the Moffatt

4

incident. (Doc. 42-3; Doc. 42-4). Moreover, on November 14, 2014, Pete Martin and Beverly Coulander met with Plaintiff and told him that his repair-related work was being turned over to Moody and that he might stop earning commission wages because he no longer supervised employees. (Doc. 42-1 at 12 [Pl. Dep., pp. 122-23]). Thus, a reasonable inference can be drawn that Plaintiff was not stripped of his repair-related duties until after he made the complaint about Moffatt.

### C. Plaintiff's 401k Hardship Distribution

On July 15, 2014, Plaintiff made a request for a hardship distribution from his 401(k) account. On the request form, Plaintiff certified that he was experiencing financial hardship in regard to "[p]ayment of expenses to repair damages to [his] principal residence." (Doc. 36-10). Nonetheless, it is undisputed that Plaintiff used the funds to pay tuition for his oldest child's primary school. (Doc. 36-2 at 12 [Pl. Dep., p. 83]). The only tuition-related option provided on the hardship distribution request form is "[p]ayment of tuition and related fees for the next 12 months or quarter of <u>post secondary</u> education for me, my spouse, or my other qualified dependents." (Doc. 36-10) (emphasis added).

### D. Plaintiff's Last Months with Aberdeen

On December 11, 2014, Aberdeen received notice that Plaintiff had filed a complaint with the Office of Civil Rights Enforcement ("OCRE") of the Oklahoma Attorney General's Office. Pete Martin was upset by this, because he "[did] not believe it to be accurate." (Doc. 42-6 at 16 [P. Martin. Dep., p. 119]).

A week later, on December 18, Plaintiff received a written warning for failing to inform a supervisor that he would be late coming back from lunch. (Doc. 36-15 at 4 [P. Martin Aff. at ¶ 24]). Plaintiff refused to sign the warning and contends that he tried, unsuccessfully, to call Pete

and ultimately left a voicemail message for Brandon Durbin explaining that he would be late. (Doc. 42-1 at 15 [Pl. Dep., pp. 134-135]). There is evidence in the record that Aberdeen had an attendance/tardiness policy providing that an employee should contact someone in management or human resources if his immediate supervisor was unavailable. (Doc. 42-7 at 6). There is also evidence suggesting that Brandon Durbin was part of management at Aberdeen. (*Id*. at 4).

In late December 2014, Plaintiff's then-wife told him she wanted a divorce. (Doc. 42-1 at 14 [Pl. Dep., p. 131]). The two separated in January 2015. (Doc. 36-2 at 8 [Pl. Dep., p. 52]). Plaintiff was emotionally devastated. (*Id*. at 4 [Pl. Dep., p. 53]). In January or February, Pete Martin learned from other Aberdeen employees that Plaintiff was going through a "bad divorce." (Doc. 42-6 at 15 [P. Martin Dep., pp. 109-10]).

On March 30, 2015, Plaintiff called in and left a voicemail message for Joe Martin, stating that he would not be coming to work that day. The unexcused absence report, which was signed by Plaintiff, states that Plaintiff did not give a reason for his absence. (Doc. 36-18 at 1; Doc. 36-2 at 30 [Pl. Dep., p. 138]).

The next day, March 31, Plaintiff called in after 10:00 a.m. and told Pete Martin that he would be out for the day and that he was "going through some family problems." (Doc. 36-18 at 2; Doc. 36-2 at 31 [Pl. Dep., p. 139]). Pete could tell Plaintiff was upset and on the verge of tears. (Doc. 42-6 [P. Martin Dep., pp. 99-100]). The next day, Plaintiff called after 12:00 p.m. and again told Pete that he would not be coming to work that day. (Doc. 36-18 at 3). He told Pete that he was having emotional problems, and Pete noted that Plaintiff sounded "very emotional." (Doc. 36-2 at 32 [Pl. Dep., p. 140]; Doc. 36-18 at 3). Plaintiff called in again on April 2 to tell Pete that he would not be coming to work. (Doc. 36-18 at 4). On April 6, Plaintiff worked for little more

6

than an hour before leaving again. (Doc. 36-18 at 5). Plaintiff has testified that he could not stay at work due to emotional problems. (Doc. 36-2 at 34 [Pl. Dep., p. 142]).

On April 7, Plaintiff called in around 10:00 a.m. and told Pete that he would not be coming to work that day. He told Pete that he could not function and was "all mixed up." (Doc. 36-18 at 6). Pete asked Plaintiff if he wanted to discuss it with him, and Plaintiff said no. Pete also asked if he was seeking help, and Plaintiff told him that he was. (*Id.*). In fact, Plaintiff had seen a doctor in March. (Doc. 36-2 at 34-35 [Pl. Dep., pp. 142-43]). This doctor diagnosed Plaintiff with depression and anxiety. (Doc. 42-1 at 4 [Pl. Dep., pp. 53-54]).

On April 8, Plaintiff called in around 10:30 and again stated that he would not be coming to work. Pete Martin had discussed Plaintiff's situation with Joe Martin the day before, telling Joe that he wanted to put Plaintiff on a supervisory referral to the Employee Assistance Program ("EAP") "to see if we can . . . get him straightened out." (Doc. 42-6 at 14 [P. Martin Dep., p. 105]). Joe agreed with the plan, and Pete informed Plaintiff that he was being referred to the EAP. (*Id.* at 13 [P. Martin Dep., p. 104]); Doc. 36-18 at 7). Plaintiff told Pete that he had already been to the EAP on his own. (Doc. 36-18 at 7).

On April 9, Plaintiff called at 12:54 p.m. and stated that he would not be coming to work that day. (Doc. 36-18 at 8). After this call, Plaintiff did not come back to work or call in again from April 10 to April 22. (*See* Doc. 36-18 at 9-17). Beverly Coulander left Plaintiff voicemail messages, but no one from Aberdeen specifically told or reminded Plaintiff that he needed to call in daily while on a supervisory EAP referral. (Doc. 36-8 at 11 [Coulander Dep., p. 76]); Doc. 42-9 at 3 [Coulander Dep., p. 74, 76]); Doc. 42-6 at 14 [P. Martin Dep., p. 106]). Plaintiff believed that the EAP would be communicating directly with Aberdeen. (Doc. 42-1 at 18-19 [Pl. Dep., pp. 147-149]).

7

On April 16, 2015, Coulander received an email from EAP Assessor David Calvert in which Calvert stated that Plaintiff had been scheduled to meet with him that day, but had needed to reschedule due to a kidney stone issue. (Doc. 36-19 at 1). Calvert also stated that he had "urged [Plaintiff] to consider the importance of the EAP Supervisory process in terms of retaining employment, as he told me that he has not called you, in spite of the fact that I strongly urged him to do so the last time I spoke with him." (*Id*.). Coulander received another email from Calvert on April 21 stating that Plaintiff had attended his second EAP Supervisory session that day. (*Id*. at 2). This email included the following message:

> Also, Hector [Saldivar] acknowledged to me that even though on multiple occasions I have strongly urged him to call you, he has, as of today, still not spoke[n] with your office since he first came to see me on 4/10/15. I once again, today, STRONGLY urged Hector to give you a call and see where he stands in terms of the future of his employment with Aberdeen. Please let me know whether or not he contacts you. If Aberdeen decides to terminate employment with him, please let me know this as well. Otherwise, I will keep you posted regarding his compliance with Kaye [Nofziger, LCSW] every week to two weeks, depending upon how often she wants to see him.

(*Id*.).

On April 22, 2015, Joe Martin made the decision to terminate Plaintiff's employment. (Doc. 36-13 at ¶ 14).

## II.    Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). "By its very terms, [the Rule 56] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of

8

*material* fact." *Anderson,* 477 U.S. at 247–48 (emphasis in original). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. The court's role at the summary judgment stage is not to weigh the evidence or resolve any disputed issues in favor of the moving party. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

## III. Discussion

### A. Title VII Retaliation Claims

In his Complaint, Plaintiff brings two distinct retaliation claims against Aberdeen. In his first claim, Plaintiff alleges that "Aberdeen retaliated against [him] for his having engaged in protected activity under Title VII by removing him from his supervisory status, stripping from him his supervisory responsibilities, and moving to reduce his compensation as a consequence." (Doc. 2 at ¶ 39). In his second claim, Plaintiff alleges that "Aberdeen retaliated against [him] for his having engaged in protected activity under Title VII by terminating his employment." (*Id.* at ¶ 43).

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A plaintiff may prove retaliation by presenting direct evidence, or he may establish retaliation indirectly,

9

using the *McDonnell Douglas* burden-shifting framework. *Ward v. Jewell*, 772 F.3d 1199, 1202 (10th Cir. 2014).

Plaintiff in this case proceeds under *McDonnell Douglas*; thus, he bears the burden of initially establishing his prima facie case of retaliation by a preponderance of the evidence. *Ward*, 772 F.3d at 1202. For each retaliation claim, Plaintiff must show "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

In order to establish a causal connection, Plaintiff "must present 'evidence of circumstances that justify an inference of retaliatory motive.'" *Ward*, 772 F.3d at 1203 (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007)). Courts may infer a causal connection "[i]f the protected conduct is closely followed by the adverse action"; otherwise, Plaintiff must provide "additional evidence" of causation to survive summary judgment. *Id*. The Supreme Court has held that retaliation claims under Title VII "require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. 338, 133 S. Ct. 2517, 2528 (2013). Such evidence of but-for causation "must be based on more than mere speculation, conjecture, or surmise." *Ward*, 772 F.3d at 1203 (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)).

If Plaintiff establishes his prima facie case, the burden shifts to Aberdeen to "offer a legitimate, nonretaliatory reason for its decision." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011). Aberdeen's burden at this stage "is one of production, not one of persuasion." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000).

10

Lastly, Plaintiff must show that Aberdeen's proffered justification for its employment decision "is merely a pretext for retaliation." *Twigg*, 659 F.3d at 998. In order to show pretext, Plaintiff "must produce evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted [nonretaliatory] reasons.'" *Argo*, 452 F.3d at 1203 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

### 1. Retaliation – Non-Discharge

Aberdeen does not dispute that Plaintiff engaged in protected opposition to discrimination when he complained about Moffatt's remarks. Aberdeen also does not dispute that Plaintiff can satisfy the second element of his prima facie case, except to point out that Plaintiff's compensation was never actually reduced after Plaintiff made his complaint about Moffatt.[3]

As for the third element, Aberdeen claims that Plaintiff cannot establish a causal connection between the protected activity and any materially adverse action taken by Aberdeen. The Court disagrees. As noted above, Plaintiff has testified that he was a supervisor "[u]ntil the day that [he] reported the Moffatt incident." (Doc. 42-1 at 3 [Pl. Dep., p. 44]). Moreover, Joe Martin has testified that he and Pete Martin had not discussed changing Plaintiff's work duties before Plaintiff made his complaint. (Doc. 42-2 at 7 [J. Martin Dep., p. 79]). Construing the evidence in favor of the non-movant, as is appropriate at this stage, Plaintiff's loss of supervisory responsibilities and status began when Plaintiff reported the Moffatt incident. This temporal proximity between the complaint and the materially adverse action by Aberdeen clearly supports

---

[3] The Court agrees that the undisputed evidence shows that Plaintiff's hourly rate was not reduced, nor was his commission pay taken away, after Plaintiff made his complaint regarding Moffatt. (*See* Doc. 36-4).

an inference of a causal connection. *See Argo*, 452 F.3d at 1202 (finding that 24 days between the employee's complaint and his termination allowed for an inference of a causal connection). This inference is bolstered by evidence that Pete told Plaintiff on March 21 that he no longer supervised employees and would no longer be advancing in the company. (Doc. 42-1 at 10, 13 [Pl. Dep., pp. 112, 128]).

Moving to the next step of the *McDonnell Douglas* framework, the Court finds that Aberdeen has articulated a legitimate, nonretaliatory reason for stripping Plaintiff of his supervisory duties. Specifically, Aberdeen asserts that there were "perceived mistakes in Plaintiff's handling of the repair-related aspect of his job duties and in his supervision of shop employees." (Doc. 36 at 25).

Finally, the burden shifts back to Plaintiff to establish pretext. Plaintiff does not appear to dispute that Pete and Joe Martin noticed mistakes in Plaintiff's work, but he presents evidence supporting an inference that his mistakes were not out of the ordinary and that his work improved over time.

Specifically, Plaintiff has testified that the "red pen situation"—referring to Pete's use of a red pen to identify mistakes in Plaintiff's work—had ended by the time Plaintiff had been in the new position for six months.[4] (Doc. 42-1 at 13 [Pl. Dep., p. 125]). Pete has testified that he thought

---

[4] Defendant asserts that Plaintiff "neither clearly recalls nor possesses personal knowledge of all of Pete Martin's activities after that six month period, or whether Pete Martin continued to identify errors through red pen marks, regardless of whether those red pen marks were themselves shown to Plaintiff." (Doc. 47 at ¶ 4). Yet, this assertion is directly contradicted by Pete Martin's own testimony. According to Pete, the purpose behind using the red pen was to "catch [Plaintiff's] attention." (Doc. 36-5 at 13 [P. Martin Dep., p. 32]). In his deposition testimony, Pete stated, "I used to have a red pen and I would circle the forms and give it back to [Plaintiff] and say you need to fix this . . . ." (*Id.*). The Court, therefore, finds that Plaintiff's testimony regarding the extent of Pete's use of the red pen is based on personal knowledge and must be taken as true for the purposes of resolving Aberdeen's summary judgment motion.

he and Plaintiff were "working through" the mistakes and that "it was getting better." (Doc. 36-5 at 13 [P. Martin Dep., p. 32]). Aberdeen's proffered justification is further undercut by evidence that Plaintiff received a raise and began earning commissions within a year of starting the new position. (Doc. 36-4).

Though Pete Martin testified to having three conversations with Joe in which Joe expressed concern over Plaintiff's job performance, Pete admittedly did not tell Plaintiff about Joe's purported concerns, and there is no written documentation of these discussions between Pete and Joe. (Doc. 36-5 at 15 [P. Martin Dep., p. 34]). Neither Pete nor Joe ever met with Plaintiff regarding performance issues. (Doc. 42-1 at 12 [Pl. Dep., pp. 121-22]). Moreover, Joe has testified that, before Plaintiff's complaint about Moffatt, "there were deficiencies and he was working at— at improving that. But that's normal—that's typical." (Doc. 42-2 at 6 [J. Martin Dep., pp. 74-75]). Joe has also testified that Plaintiff "performed well" when Pete was on medical leave from mid-November 2013 until mid-January 2014, even though Pete asserts that he observed a large amount of errors when he came back from leave. (*Id*. at 5 [J. Martin Dep., p. 53]; Doc. 36-5 at 19 [P. Martin Dep., p. 39]).

This evidence, coupled with Plaintiff's testimony that Pete told him outright on March 21 that his advancement in the company was over—and his testimony that he lost his supervisory duties and status after making the Moffatt complaint—convinces the Court that a reasonable factfinder could find Aberdeen's proffered justification to be unworthy of credence. Because Plaintiff has established a genuine dispute of material fact in regard to pretext, summary judgment on this claim is inappropriate.

## 2. Retaliation – Termination

Plaintiff, in his second claim, alleges that his termination was also retaliatory. Again, there is no dispute that Plaintiff can satisfy the first two elements of his prima facie case. Aberdeen argues, instead, that Plaintiff cannot establish a causal connection between "protected opposition" and his termination. Importantly, the "protected opposition" relevant to this claim includes both his complaint about Moffatt in March 2014 and his filing of a Charge of Discrimination in December 2014.

Unlike in Plaintiff's first charge, there is no close temporal proximity here. Plaintiff was terminated on April 22, 2015—four months after he filed the Charge of Discrimination and eleven months after making his initial complaint about Moffatt. The Tenth Circuit has held that "a three-month period, standing alone, is insufficient to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

Upon review of the record, the Court finds no additional evidence tying Aberdeen's termination of Plaintiff's employment to Plaintiff's complaint in March or his Charge of Discrimination in December. *See Ward*, 772 F.3d at 1203. While it may be suspicious that Plaintiff was issued a disciplinary warning soon after Aberdeen learned of his Charge of Discrimination, this write-up was so far removed in time from his termination that the Court finds it irrelevant.

Because Plaintiff has failed to establish a causal connection between his acts of protected opposition and his eventual termination, his second retaliation claim cannot survive summary judgment.[5]

---

[5] Even assuming Plaintiff could establish his prima facie case for this second retaliation claim, the Court finds that he would be unable to establish pretext for the reasons set out in the Court's discussion of Plaintiff's ADA claim.

B.  **Plaintiff's ADA Discrimination Claim**

In his third and final claim, Plaintiff alleges that the termination of his employment with Aberdeen constitutes unlawful employment discrimination in violation of the ADA. (Doc. 2 at ¶¶ 46-51). The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Plaintiff alleges that, due to his depression and anxiety, he was a person with a disability within the meaning of the ADA and that this disability "and/or Aberdeen's belief that Plaintiff had a mental impairment" motivated Aberdeen's decision to terminate his employment. (Doc. 2 at ¶¶ 47-49).

Claims of disparate treatment based on a disability are generally analyzed through the *McDonnell Douglas* framework. First, Plaintiff must establish his prima facie case. He must show that "(1) [he] is disabled within the meaning of the ADA; (2) [he] is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) [he] was discriminated against because of [his] disability." *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015).

If Plaintiff can establish his prima facie case, the burden shifts to Aberdeen to articulate "a legitimate, nondiscriminatory reason for the adverse employment decision." *Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 747 (10th Cir. 1999). "If the defendant is able to articulate a valid reason, the plaintiff has the opportunity to prove that the defendant's stated reason 'was in fact pretext.'" *Id*. at 747-48 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)).

Aberdeen contends that Plaintiff cannot satisfy the third element of his prima facie case because he cannot show that the circumstances of his termination give rise to an inference of discrimination. The Court finds that, even if it presumes that Plaintiff can satisfy all three prima

facie elements, Plaintiff has failed to establish a genuine dispute of material fact as to whether Aberdeen's given reason for firing him is pretextual.

Aberdeen's proffered nondiscriminatory justification for terminating Plaintiff's employment is that he stopped coming to work and stopped calling in. As discussed in detail earlier in this Opinion, Plaintiff worked little more than an hour between March 30 and April 22, 2015. (*See* Doc. 36-18). For the last nine work days before he was terminated, Plaintiff was reported as "no call, no show." (*Id*. at 9-17).

Plaintiff's pretext argument relies on his assertion that he was not required to call in once he was under a supervisory EAP referral. To support this notion, Plaintiff points to the following testimony by Beverly Coulander:

> A: The EAP is available to all employees, and they can go, without any knowledge to the – they would – they could go at any time or anybody in their household could go at any time without any knowledge of the company. We wouldn't even know that they were there.
>
> Q: Right.
>
> A: But if it's supervisor referral, then they let us know that they were there and were compliant or they were not compliant.
>
> Q: [. . .] Do you know, if there's a supervisory referral to the EAP – and, again, assuming that they were compliant, would the employee have to call in on a daily basis to the – to Aberdeen?
>
> A: *I – I don't know. I don't think so.* You're saying if they were under supervisor referral?
>
> Q: Yes.
>
> A: No, but they might still be coming to work and go, you know, like, in the middle of the day, end of the day.

(Doc. 42-9 at 2 [Coulander Dep., p. 71]) (emphasis added). There is also evidence that Aberdeen recorded Plaintiff's absences immediately prior to his termination as extended sick leave

(ESL) per Joe Martin's instructions. (*See* Doc. 42-17). These same records appear to show that Plaintiff used up the balance of his paid time off (PTO) hours on April 10, at which point the company began to apply his ESL hours. (*Id.*).

"The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to avoid summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The use of PTO/ESL hours presumably allowed Plaintiff to be paid for those days, despite being absent; it does not reasonably support an inference that Aberdeen's eventual decision to terminate Plaintiff was inconsistent or unworthy of credence. Coulander's testimony, alone, cannot carry the day when the Plaintiff ultimately has the burden to prove pretext by a preponderance of the evidence. *See Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011).

To the extent Plaintiff argues that he *believed* he did not have to call in while under supervisory EAP referral, the court must "examine the facts as they appear *to the person making the decision.*" *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011) (quoting *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160 at 1166 (10th Cir. 2007)) (emphasis in original). In cases arising under the ADA, the Court's role is not to sit "as a super personnel department that second guesses employers' business judgments." *Mason v. Avaya Comm'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004). Here, not only did Joe see that Plaintiff had been absent, without calling in, for over a week, he also had reason to believe that EAP personnel had told Plaintiff that he needed to be calling Aberdeen while participating in the EAP. (*See* Doc. 36-19, Doc. 36-13 at ¶ 14). In reviewing the record as a whole, the Court cannot say that Aberdeen's proffered explanation for terminating Plaintiff is "so inherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [it is] unworthy of belief." *C.R. England, Inc.*, 644 F.3d at 1039-

40 (quoting *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010)). Because Plaintiff is unable to establish pretext, summary judgment in favor of Aberdeen is appropriate as to this claim.

IV. **Aberdeen's After-Acquired Evidence Doctrine Defense**

In the last part of its Motion, Aberdeen urges the Court to limit Plaintiff's potential damages pursuant to the after-acquired evidence doctrine. The Supreme Court has held that "[o]nce an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore that information, even if its acquired during the course of discovery in a suit against the employer and even if the information might have gone discovered absent the suit." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995). "The beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." *Id*.

The Tenth Circuit has established a two-step process for district courts to follow in applying *McKennon*:

> First, the employer must establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge. Second, and only after an employer has met this initial showing, the after-acquired evidence may then be considered to limit the damages remedy available to the wrongfully terminated employee.

*Perkins v. Silver Mountain Sports Club & Spa, LLC*, 557 F.3d 1141, 1145 (10th Cir. 2009) (internal quotation marks and citations omitted).

Aberdeen contends that, during discovery for this case, it learned that Plaintiff submitted a fraudulent request for a hardship distribution from his 401k in July 2014. Aberdeen further asserts that, had it known, it would have immediately terminated Plaintiff's employment. (*See* Doc. 36-13 at ¶ 13). Plaintiff counters that his testimony was that he intended to use the money for the

18

permissible purpose cited in his request, but later decided to pay the private school tuition instead. (Doc. 42 at 32).

In light of this Court's decision to grant summary judgment in favor of Aberdeen as to Plaintiff's second and third claims, the Court finds this after-acquired evidence argument moot. Plaintiff's only remaining claim is not premised on Plaintiff's termination, nor is it premised on a loss of wages.[6] A defense limiting the recovery of backpay is, therefore, unnecessary.

Defendant Aberdeen's Motion for Summary Judgment (Doc. 36) is hereby **denied** as to Plaintiff's non-discharge retaliation claim. Aberdeen's Motion is **granted** as to Plaintiff's termination retaliation claim and his ADA claim. The Motion is **moot** to the extent it concerns Aberdeen's after-acquired evidence defense.

ORDERED this 16th day of February, 2018.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE

---

[6] Although Plaintiff alleges in his Complaint that he suffered "a loss of earnings and benefits" as a result of the alleged non-discharge retaliatory action taken by Aberdeen (Doc. 2 at ¶ 40), Plaintiff has presented no evidence that his wages changed in any way from the time he made the Moffatt complaint in March 2014 until the day he was terminated. There is only evidence that his commission pay was *threatened* in November 2014. (Doc. 42-1 at 12 [Pl. Dep., pp. 122-23]).